**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JOHN BENTON CROSS, JR.,**

     **Plaintiff,**

**vs.**                                              **CIVIL ACTION NO. 2:16-cv-03654**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. By Order entered April 15, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 16.)

The Plaintiff, John Benton Cross, Jr. (hereinafter referred to as "Claimant"), protectively filed his application for Title XVI benefits on April 17, 2012, alleging disability since September 21, 2010[1] due to "ADHD, bi-polar, severe social anxiety, moderate depression, and anger issues". (Tr. at 198-203, 220.) His claim was denied on August 7, 2012 (Tr. at 88-92.) and again upon reconsideration on January 14, 2013. (Tr. at 96-98.) Thereafter, Claimant filed a written request

---

[1] Claimant provided an alternative, potential onset date of April 17, 2012, the application date. (Tr. at 216.)

for hearing on March 16, 2013 (Tr. at 100-102.) and an administrative hearing was held on August 5, 2014 before Administrative Law Judge ("ALJ") William Paxton, but was continued to allow Claimant to obtain representation. (Tr. at 31-40.) A new hearing was held on October 27, 2014 before ALJ Harry C. Taylor, II. (Tr. at 41-63.) The ALJ heard the testimonies of Claimant (Tr. at 48-58.), Medical Experts ("ME") John Menio, M.D. (Tr. at 45-46.) and Evelyn Adamo, Ph.D. (Tr. at 46-47.), and Vocational Expert ("VE") Nancy Shapero. (Tr. at 43-48.) On November 13, 2014, the ALJ entered a decision denying benefits. (Tr. at 14-30.)

Claimant sought review by the Appeals Council on December 9, 2014 (Tr. at 12-13, 271-272.); after being informed that the Appeals Council had no record of the pending appeal, Claimant resubmitted his request on July 14, 2015 (Tr. at 6-10.) Subsequently, the ALJ's decision became the final decision of the Commissioner on February 18, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On April 14, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). [2] If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

---

[2] The citations herein are to the pertinent Regulation in effect at the time of Claimant's application; the undersigned recognizes that these Sections have since been amended, but the recent amendments did not re-designate or change the substance of the pertinent paragraphs discussed herein. Indeed, the citations used in this Proposed Findings and Recommendation bear no apparent deviation or change from the current Regulations.

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

(C) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

4

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4) and 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the application date, April 17, 2012. (Tr. at 19, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairment: generalized anxiety disorder. (Id. at Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") "to perform all full range of work at all exertional levels but with the following non exertional limitations: he would be limited to low stress work that does not involve production quotas or high level decision making and could have only limited contact with the public." (Tr. at 21, Finding No. 4.) At step four, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 24, Finding No. 5.) At step five of the analysis, the ALJ found Claimant was 23 years old as of date the application was filed, which is defined as a younger individual. (Id. at Finding No. 6.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id. at Finding No. 7.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id. at Finding Nos. 8, 9.) On this basis, benefits were denied. (Tr. at 26, Finding No. 10.)

6

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

He was born on March 2, 1989, making him 23 years old, defined as a "younger person" by the Regulations. (Tr. at 24.); See 20 C.F.R. § 404.1563(c). Claimant earned a general education diploma. (Tr. at 221.) His work history includes employment as a fast food cook, a gas station cashier, a janitor and a stocker. (Tr. at 222.) The Certified Earnings Record indicated that Claimant did not work the level of substantial gainful activity in any of these positions. (Tr. at 207.)

The Medical/Educational Record

The undersigned has considered the evidence as asserted by Claimant and the Commissioner, pertinent to this appeal:

Educational Records:

Claimant initially attended Capital High School in Charleston, West Virginia from 2003-2004, before attending Harrisonburg High School in Harrisonburg, Virginia from 2004-2007. (Tr. at 260-263.) Claimant's grade point average went from .71 to 1.13. (Tr. at 260.) He repeated the ninth grade, but was placed in "regular education, no special instruction." (Tr. at 258.)

CrossLanes Internal Medicine Group:

The record indicates that Claimant had been treated at Cross Lanes by Arvind Viradia, M.D. from October 26, 2010 to June 3, 2014. (Tr. at 273-289, 300-311, 315-323, 339-348.) During this time, Dr. Viradia provided medication management for diagnoses of bipolar disorder, generalized anxiety disorder, depression, anxiety, ADHD, social phobia, and panic disorder. (Tr. at 273-77, 280-83, 286-87, 302-08, 315-17, 320-23, 343-45.) On October 26, 2010, Claimant complained of mood swings, "being mad," and feeling anxious when he thought about looking for a job because he lost 11 jobs in the past 2 ½ years due to anger. (Tr. at 275.) However, the record shows that he had four jobs from 2008 to 2010. (Tr. at 213.) In December 2010, Dr. Viradia noted that Claimant was doing better, recently got a job, and that his anger seemed to be under control. (Tr. at 273.) In January 2011, Dr. Viradia noted that Claimant was doing much better on his current medications and had been working for approximately two weeks. (Tr. at 276.) In February 2011, Claimant told Dr. Viradia that he was doing better with depression and anger and had been able to maintain a job. (Tr. at 280.)

By January 2012, Claimant complained of anxiety, depression, and anger issues again. (Tr.

at 282.) Dr. Viradia noted that his mood and affect were normal, and instructed Claimant to follow up at the emergency room if he did not feel better, or experienced suicidal/homicidal ideation. (Tr. at 283.) The record does not reflect that Claimant ever sought emergency room treatment for his alleged mental impairments. In March 2012, Claimant reported that his social anxiety had worsened. (Tr. at 286.) On April 10, 2012, one week before he applied for SSI, Claimant told Dr. Viradia that his social anxiety and anger had improved quite a bit with current medications. (Tr. at 216, 302.)  In June 2012, Claimant stated that he was well except for frequent panic attacks and anger problems. (Tr. at 304.) On September 11, 2012, Claimant reported that he was doing fair, was not working because he could not control his anger, was living with his sister, and had applied for disability. (Tr. at 306.)

On March 5, 2013, Claimant saw Dr. Viradia and asked for a letter to show the judge in connection with his disability claim. (Tr. at 316.) Dr. Viradia noted Claimant "doesn't want to do or go anywhere, wants to stay home all the time and not have to socialize with anybody but family"; it was noted that Claimant "is not able to take care of himself and act in his own interest, even while on medication" – "[s]ide effects from medicine makes it even more harder to focus". (Id.) Consistent with previous examinations, Dr. Viradia found that Claimant was alert and oriented, had no memory impairment, and that his mood and affect were normal. (Tr. at 282, 286, 302, 304, 307, 316.) On March 8, 2013, Dr. Viradia wrote a letter in which he stated that he had followed Claimant for three years, and despite medication, Claimant could not work due to issues of concentration and anger. (Tr. at 315.) Dr. Viradia concluded that Claimant would never be able to work and was totally and permanently disabled. (Id.) Dr. Viradia reported that Claimant had lost approximately 13 jobs in the last two to three years (Id.), however, a January 2013 SSA query

9

indicated that for the years 2008 through 2012 Claimant worked for four employers during that four-year period. (Tr. at 211-213.) On October 8, 2013, Dr. Viradia noted that Claimant's depression and anger were well controlled, but that he could not maintain a job due to episodic panic attacks. (Tr. at 322.) On March 11, 2014, Claimant reported that he was sleeping better with medication. (Tr. at 343.)

Thomas Memorial Hospital:

On May 20, 2013, Claimant presented to the emergency room with abdominal pain that was diagnosed as acute appendicitis; he underwent a laparoscopic appendectomy, which he tolerated well. (Tr. at 324-338.)

State Agency Psychological Examiner:

On June 26, 2012, Kara Gettman-Hughes, M.A., interviewed Claimant for a mental status examination; she reviewed records from Dr. Viradia, Claimant's Function Report and the SSA Disability Report. (Tr. at 290-295.) Claimant's sister also accompanied him to the examination. (Tr. at 290.) He reported that he is applying for benefits because he has anger issues and social anxiety, where he does not like to leave the house and gets easily frustrated causing him to strike walls, including himself. (Tr. at 291.) His last job was in 2010 where he worked at a bank as a janitor; he was fired because he was late for work. (Id.) He completed the 10th grade and was retained twice; he was in special education classes for all subjects. (Tr. at 292.) He was expelled from school for fighting and truancy, but later obtained his GED. (Id.)

The mental status examination revealed that Claimant was cooperative, with responsive and coherent speech, although "somewhat laconic." (Id.) He was oriented to time, person, place, and date. (Id.) His mood was "remarkable for extreme anxiety" and his affect congruent to his

mood. (Id.) Ms. Gettman-Hughes observed Claimant's thought processes, thought content, perceptual, judgment, psychomotor behavior, immediate and recent memory all appeared normal. (Tr. at 292-293.) Remote memory was deemed fair. (Tr. at 293.) Claimant's insight was poor based on his responses to social awareness, and he admitted to prior suicidal and homicidal ideation, but denied any current intent or ideation. (Tr. at 292.) Claimant's concentration, persistence, and pace were normal. (Tr. at 293.) Based on clinical observations, Claimant's social functioning was deemed mildly impaired. (Id.) Based on Claimant's self-report, he was deemed capable of performing his activities of daily living. (Tr. at 294.)

Ms. Gettman-Hughes diagnosed Claimant with generalized anxiety disorder, panic disorder with agoraphobia, and bipolar disorder, NOS; his prognosis was poor. (Tr. at 293-294.) Ms. Gettman-Hughes opined that Claimant could manage his own finances. (Tr. at 294.)

State Agency Psychological Consultant:

On August 2, 2012, Philip E. Comer, Ph.D., a state agency psychological consultant, completed a Psychiatric Review Technique form. (Tr. at 67-68.) Dr. Comer found that Claimant had anxiety disorders and affective disorders that did not manifest at listing level severity. (Tr. at 68.) On August 2, 2012, Dr. Comer also performed a mental residual functional capacity assessment (MRFC) based on his review of the record. (Tr. at 69-71.) In assessing understanding and memory, Dr. Comer found that Claimant had no significant limitations in his ability to remember locations and work-like procedures; could understand and remember very short and simple instructions; and had moderate limitations in his ability to understand and remember detailed instructions. (Tr. at 69-70.)

With respect to concentration and persistence, Dr. Comer found that Claimant had no

significant limitations in his ability to carry out very short and simple instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, and to make simple work-related decisions; Claimant had moderate limitations in his ability to carry out detailed instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 70.) In the area of social interaction, Dr. Comer found that Claimant had no significant limitations in his ability to ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; and moderate limitations in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 70-71.)

In assessing adaptation, Dr. Comer found that Claimant had no significant limitations in his ability to be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others; and moderate limitations in his ability to respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation. (Tr. at 71.) Notwithstanding these limitations, Dr. Comer found that Claimant had the MRFC to perform simple, routine work-like activity in a work environment with minimal social interaction/travel requirements. (Id.)

On January 13, 2013, State agency psychologist Jeff Boggess, Ph.D., independently

reviewed the updated record and affirmed Dr. Comer's MRFC assessment as written. (Tr. at 79, 81-83.)

SSA Forms:

The record includes the Disability and Function Report as well as other standard SSA documents filed in support of Claimant's claim; these were completed by Claimant's sister, Amber Marrie Cross ("Ms. Cross"), who initially acted as her brother's representative until he obtained professional representation. (Tr. at 31-40, 219-257, 265.) Ms. Cross submitted the following statements regarding Claimant in his application for benefits:

- [N]ot sure of exact date last job was but he has been fired for just about every job due to his anger issues and ability to remain calm and be in an environment with other people (Tr. at 221.)

- More depressed, angry, quick to react. Doesn't come out of his room much and has lost interest in his personal hygiene and appearance (Tr. at 252.)

- He's very depressed and doesn't [*sic*] shower as often as usual and stays in the same clothes for days at a time. He doesn't come out of the room except to use bathroom or eat dinner when I fix it. Like I've said, he is physically able to do some things to take care of himself but is not capable mentally to be on his own and act in his own interest (Tr. at 255.)

- Still not leaving the house. Don't do hardly any physical [*sic*] activity around the house to help out more. Still cannot be in a normal social setting with people without the fears and worries he suffers from (Id.)

- Like I have been saying since beginning of this process, he is able to physically take care of himself, but not mentally or socially. He is not able to act in his own interest in everyday social settings and would constantly need some type of help if he ever did try to get out and do anything. Side effects from the medicine make it worse. I have a note from the [doctor] [w]ith his medical opinion that John will never be able to care on his own and be able to hold a job (Tr. at 256.)

The Administrative Hearing

<u>Claimant's Testimony:</u>

Claimant testified that he was not married, had no children, and had a medical card. (Tr. at 48-49.) He also testified that he completed the 10th grade in special education classes and subsequently obtained a GED. (Tr. at 49.) He stated he previously worked as a gas station cashier, a fast food worker, a janitor, and a stocker. (<u>Id</u>.) He stated that he could write, but not read well; he could sign his name, read a letter, read parts of a newspaper, tell time, make change, and recognize routine signs in public such as traffic signs. (Tr. at 49-51.) He testified that he had an expired driver's license and had to take the driving test two times before passing it. (Tr. at 51, 53.) He had not received mental health treatment from a psychologist or a therapist, but was treated for anxiety by his primary care physician, Dr. Viradia. (Tr. at 51.) He stated that he experienced panic attacks when around a large number of people or crowd. (<u>Id</u>.) He said his manic episodes could last an hour or all day, and that he had been depressed for "a while now". (Tr. at 52.) He testified that he smoked marijuana occasionally when "so stressed out" or "so mad and angry" and needs to calm down quickly. (<u>Id</u>.) He claimed that he had to deal with anger his whole life, but that it had never resulted in his having to go to jail, although if provoked, he would possibly try to hit someone. (Tr. at 53.) He tried counseling for his anger, but it did not help. (<u>Id</u>.) He liked sports, including baseball, basketball, and football, but he does not play sports anymore because he does not like being around people. (Tr. at 53-54.)

Claimant testified that he had been living with his sister for four or five years.; he never tries living on his own. (Tr. at 54-55.) He claimed that he had a lot of arguments with his sister and would "flip out" when she kicked him out of the house; he would punch holes in the wall, cuss and scream, and anything can cause him to do this. (Tr. at 56.) The last time he flipped out, he

could not remember why. (Tr. at 56-57.) Claimant also testified that he had one friend with whom he denied ever having an argument. (Tr. at 53, 57.)

In describing a typical day, he testified that he got up around 3:00 p.m., read a note from his sister describing the household chores she wanted him to do, did his chores, and would then play video games all day because it kept his mind focused. (Tr. at 57-58.) He takes care of himself, such as showering daily, and takes his medication as prescribed. (Tr. at 55-56.) He claimed that he had been fired from all of his previous jobs because of his short attention span and anger, but mostly due to his anger. (Tr. at 58.)

<u>John Menio, M.D., Medical Expert:</u>

Dr. Menio testified that Claimant did not have any physical impairments that would meet or equal listings, but did have "some psychiatric issues." (Tr. at 45-46.)

<u>Evelyn Adamo, Ph.D., Medical Expert:</u>

Dr. Adamo testified that Claimant had one severe impairment, generalized anxiety disorder. (Tr. at 46.) She opined that Claimant would have moderate difficulties in activities of daily living, social functioning, and concentration, persistence, or pace. (<u>Id</u>.) She opined that Claimant was limited to simple work in a low-stress environment with limited public contact. (Tr. at 46-47.) Dr. Adamo testified that no one has observed Claimant's anger outbursts, that the primary care doctor noted that his anxiety, depression, and anger is well controlled by medication, and that it was not "particularly" reasonable to expect anger outbursts with an anxiety disorder. (Tr. at 47.)

<u>Nancy Shapero, Vocational Expert:</u>

The ALJ asked the VE to assume that a hypothetical individual would be limited to low

stress work that did not involve production quotas or a high level of decision making, and would require limited contact with the public. (Tr. at 59-60.) Given Claimant's vocational profile and the aforementioned limitations, the VE testified that the individual could perform the medium jobs of sorter, assembler, and loader helper, the light jobs of assembler, price marker, and janitor, and the sedentary jobs of addresser, assembler, and electronics worker. (Tr. at 59-61.)

Claimant's representative asked the VE to assume the individual would have altercations with coworkers or supervisors monthly, was unable to maintain attention and concentration at less than 80 percent of the time, or have no contact with the public, coworkers, or supervisors on a regular basis, the VE opined the individual would not be able to maintain work. (Tr. at 61-62.)

Claimant's Challenges to the Commissioner's Decision

There are three main issues challenged by Claimant: the first is that the ALJ ignored the medical evidence from the treating source and failed to give deference to the treating opinion per Regulations; the second is that the ALJ erred in his analysis of the opinions provided by State agency consultants resulting in an RFC unsupported by substantial evidence; the third involves the ALJ's failure to consider Claimant's sister's statements as required under the Regulations. (Document No. 11 at 6-19.)

Evaluation of Treating Source:

Claimant contends that Dr. Avind Viradia is defined by the Regulations as a "treating source" and therefore entitled to special deference so long as the treating source opinions are consistent with the other substantial evidence of record. 20 C.F.R. §§ 416.902, 416.927(d)(2), SSR 96-2p, Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). (Id. at 8-9.) Claimant further argues that when 20 C.F.R. § 416.927 was issued, that the Commissioner specifically has stated that with

16

"[a]ll things being equal…[the Commissioner] will *always* give greater weight to the treating source's opinion than to the opinions of nontreating sources *even if* the other opinions are also reasonable or even if the treating source's opinion is inconsistent with other substantial evidence of record" 56 Fed. Reg. at 36, 936 (emphasis in original).[4] (Id. at 8.) Because the ALJ failed to provide "good reasons" for giving "no weight" to Dr. Viradia's opinion, he deviated from the Commissioner's Regulations. (Id. at 9-10.) Claimant points out that this Court previously held that "[t]he requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, and it 'also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." Newhart v. Colvin, No. 6:13-cv-01606, 2014 WL 1330929, at *4 (S.D.W.Va. March 31, 2014). (Id. at 10-11.) Without giving good reasons, remand is warranted. Id. (citing Saul v. Astrue, No. 2:09-cv-1008, 2011 WL 1229781, at *3 (S.D.W.Va. March 28, 2011). (Id. at 11.)

Next, Claimant argues that the ALJ's improper evaluation of the mental RFC assessments provided by Drs. Comer and Boggess resulted in a defective RFC assessment insofar as he gave no explanation how he considered those opinions or why he did not include their limitations into his own RFC assessment. (Id. at 11-13.) Further, Claimant contends that the ALJ's assigning Dr. Adamo's opinion "greater weight" is notable when she did not cite any medical evidence in support of her opinion. (Id. at 13.) Claimant argues that the Regulations and SSR 96-8p requires the ALJ to conduct a proper evaluation and resolution of the inconsistencies in order to "build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 2016 WL 3349355 (4th Cir. 2016). (Id. at 13-14.)

---

[4] See, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003).

Finally, Claimant argues that the ALJ deviated from the Commissioner's rules and Regulations, as well as applicable case law where he never considered the statements from Claimant's sister, which were included in the Social Security forms she completed on his behalf because he did not understand them. (Id. at 14-18.) Claimant contends that the Regulations clearly require an ALJ to consider all relevant evidence in the record, including evidence from non-medical sources such as family members, particularly when such evidence has an effect on the outcome of the case. See, 42 U.S.C. §§ 223(d)(5), 1614(a)(3)(H), 20 C.F.R. § 416.913(d)(4), SSR 06-3p. (Id. at 14-15.) Because the ALJ's failure to consider Claimant's sister's statements, the omission is not harmless[5], as her opinion evidence contradicted Dr. Adamo's testimony, particularly where she stated on the record that "no one observed any anger outburst." (Id. at 16-19.)

Claimant concludes that these cumulative errors necessitate remand in order for the Commissioner to correct them, as the decision is unsupported by substantial evidence. (Id. at 19.)

With regard to Claimant's first ground of alleged error, the Commissioner argues that the ALJ properly gave no weight to Dr. Viradia's conclusory opinions that Claimant was totally disabled and would never be able to work because the Regulations are clear that such determinations are reserved to the Commissioner only. 20 C.F.R. § 416.927(d)(1)-(3). (Document No. 16 at 11-13.) Further, the Commissioner argues that Dr. Viradia's opinion was based on Claimant's self-reports, and were not the product of clinical evidence of work-preclusive functional limitations, as is necessary per Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996); See also, Mortenson v. Astrue, 2008 WL 1826185, at *5 (D.S.C. April 23, 2008) (citing Johnson

---

[5] Morgan v. Barnhart, 142 F.App'x 716, 722-723 (4th Cir. 2005) (unpublished).

v. Barnhart, 434 F.3d 650, 657 (4th Cir. 2005). (Id. at 13.) The Commissioner also points out that Dr. Viradia's treatment notes consistently indicated that Claimant's functional limitations were normal (Id.); medical evidence that is internally inconsistent or inconsistent with the other evidence is properly discounted. 20 C.F.R. § 416.927(c)(2); see also Craig, 76 F.3d at 590. (Id. at 14.) The Commissioner also contends that contrary to Claimant's argument, the ALJ did explain how he weighed Dr. Viradia's opinion, as psychology was not his field of expertise, and is therefore not entitled to the greater weight normally afforded to the opinions of those experts related to their area of specialty. (Id.) The ALJ gave more weight to Dr. Adamo's opinion because of her specialty in Claimant's severe impairment, her familiarity with the entire record and her program knowledge, and further, such medical experts are endorsed by the Regulations. (Id. at 14-15.)

The Commissioner also argues that because Drs. Comer and Boggess were not examining or treating sources, the ALJ did not have to give "good reasons" in discounting their opinions, and further, the ALJ did not have to adopt their mental RFC assessments into his own. (Id. at 15-16.) Further, the actual mental RFC assessments provided by Drs. Comer and Boggess was that Claimant had the capacity to perform simple routine work activity in a work environment that had minimal social interaction/travel requirements, which the ALJ did consider, he was not required to discuss what portions of their summaries he rejected or accepted. (Id. at 16-17.) The Commissioner contends that the ALJ considered the opinions of treating, examining, and reviewing physicians and provided an explanation for the weights given to each, which is supported by substantial evidence. (Id. at 17.)

The ALJ did not have to find that Dr. Viradia's unsupported diagnosis of bipolar was a

severe impairment, because he already found one mental severe impairment and proceeded in the sequential evaluation process as was proper, and omission of the bi-polar diagnosis was harmless. (Id. at 17-18.) The ALJ considered Claimant's limitations associated with his ability to function from a mental standpoint, performed the special technique required for evaluating mental impairments, along with the overall evidence in the record in determining the RFC assessment, but ultimately found that based on the evidence, Claimant was not disabled. (Id. at 18.) The Commissioner contends that the ALJ reconciled the conflicts in the medical evidence, provided a "logical bridge" from the evidence to his conclusions regarding the medical source opinion evidence, thus lending the substantial evidence supporting the weights he assigned to those opinions. (Id. at 19.)

Finally, with regard to Claimant's argument that the ALJ failed to consider his sister's statements, the Commissioner argues that Ms. Cross did not testify at either hearing and did not provide a third party statement in connection with Claimant's application for SSI. (Id. at 19-20.) The Commissioner states that Ms. Cross completed the forms on Claimant's behalf, intending the statements therein to be his own, because she was serving as his representative at the time. (Id. at 20.) ALJ Paxton explained to Ms. Cross that he would not swear her in at the first hearing because she was acting as Claimant's representative, and representatives do not testify. (Id. at 19.) The SSA has a Third Party Form specifically for third party responses that Ms. Cross did not complete, and therefore did not provide her own opinions, therefore, there is no need for an independent assessment of her credibility. See Muncy v. Colvin, 2014 WL 46607151, at *5-6, n.3 (S.D.W.Va. September 17, 2014); see also Robinson v. Astrue, 2011 WL 1656120, at *6 (C.D. Cal. May 3, 2011); Olson v. Colvin, 2016 WL 3747878, at *8 (N.D. Iowa July 8, 2016). (Id. at 21-22.)

The Commissioner also points out that an ALJ is not required to specifically refer to every piece of evidence in the record per <u>Reid v. Comm'r of Soc. Sec.</u>, 769 f.3d 861, 865 (4th Cir. 2014). (<u>Id</u>. at 22.) Again, the Commissioner argues that the ALJ made no error when he failed to attribute the reports or form to Ms. Cross, as she made those statements as Claimant's representative at the time. (Id.) Further, the Commissioner argues that Ms. Cross's statements is cumulative to the evidence provided by Claimant's testimony. (<u>Id</u>. at 22-23.) The Commissioner contends that if the "ALJ had an obligation to discuss/assess a function report prepared by a family member, . . ., the failure to do so would be harmless error unless Claimant can show he was prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses[]"[6], and Claimant has not proved such prejudice. (Id. at 24.) Moreover, Ms. Cross's contradictory "opinion evidence" to Dr. Adamo's, is non-medical, and was not qualified to establish the existence of a medically determinable impairment per SSR 06-3p and 20 § C.F.R. 416.913. (<u>Id</u>.) The Commissioner argues that ALJ considered Claimant's own statements in the context of the evidence as a whole, and further, because Ms. Cross did not testify under oath or provide her own Third Party Report reflecting her own opinions, there is no basis to remand this matter for further articulation of her alleged statements. (<u>Id</u>. at 25.)

The Commissioner concludes that the decision is supported by substantial evidence. (<u>Id</u>.)

In reply, Claimant contends that the Commissioner failed to appreciate that the ALJ did not follow her own Regulations in discussing Dr. Viradia's treating source opinion, and further, Dr. Viradia did provide an assessment of Claimant's functional limitations. (Document No. 17 at 1-2.) Claimant argues that Dr. Viradia expressly opined that Claimant had functional limitations

---

[6] <u>Cook v. Colvin</u>, 2015 WL 430880, at *17 (S.D.W.Va. September 23, 2013) (citing <u>Morgan</u>, 142 F.App'x at 722-723) (additional citations omitted).

that would preclude him from work, specifically because of his anger and concentration issues; because this finding was not considered by the ALJ, his RFC assessment was defective akin to the situation in <u>Mascio v. Colvin</u>, 780 F.3d 632, 636-637 (4th Cir. 2015). (<u>Id</u>. at 3.) Claimant further argues that Dr. Viradia's opinion, as a treating source, was entitled to deference under the Regulations, and further, because the ALJ did not provide any "good reasons" for the weight he gave Dr. Viradia's opinion, the Court has no way of evaluating his decision, thus remand is warranted.[7] (<u>Id</u>. at 4.)

Claimant also succinctly argues that the Commissioner's own rules provide that with regard to the evaluation of medical opinion evidence, an ALJ can accept and include them or reject and explain why, but in this case, the ALJ failed to provide reasons for what portions of the State agency consultants' opinions he accepted or rejected. (<u>Id</u>. at 4-5.)

Finally, with respect to Ms. Cross's statements, Claimant contends that it is undisputed that Ms. Cross completed Claimant's application forms, and the Commissioner's characterizing her statements as those made by a representative and not lay witness statements is unsupported by any Regulation, policy or case law. (Id.) Further, Claimant again argues that Ms. Cross's statements "materially contradict" Dr. Adamo's testimony that no one observed Claimant's anger outbursts, and are not medical opinion evidence, therefore, are not being used to establish the existence of a medically determinable impairment. (<u>Id</u>. at 6.) Claimant points out that in <u>Fuller v. Colvin</u>, 2016 WL (S.D.W.Va. 2016), the Court remanded where an ALJ failed to consider personal observations contained in a letter from a lay person as they were of value to determine the claimant's limitations, and that Ms. Cross's statements were entitled to consideration and evaluation, particularly where

---

[7] <u>Radford v. Colvin</u>, 734 F.3d 288, 295 (4th Cir. 2013).

they contradicted the medical opinion assigned the greater weight for the RFC assessment. (Id. at 6-7.)

In sum, Claimant requests an order reversing and remanding the Commissioner's decision for an award of benefits, or alternatively, for the ALJ to correct the errors below. (Id. at 7.)

Analysis

Evaluating Treating Physician Opinions:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is more likely to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's opinion is afforded "controlling weight" if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Id. The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id.

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii) and (c)(3)-(6), 416.927(c)(2)(i)-(ii) and (c)(3)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors[8]. Additionally, the Regulations state that the

---

[8] 20 C.F.R. § 404.1527(c)(6) provides:

When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability program and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other

Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

In this case, the ALJ reviewed records from Dr. Viradia dated from October 26, 2010 through March 11, 2014 with reference to Claimant's medically determinable mental impairments, and noted that on October 26, 2010, Dr. Viradia treated Claimant for diagnoses of anxiety and bipolar disorder. (Tr. at 22.) The ALJ noted that in the first treatment note, Claimant reportedly was experiencing mood swings and "being mad", being scared and feeling anxious about looking for a job. (Id.) The ALJ noted that a record dated December 7, 2010 indicated Claimant was doing better and recently got a job, and that his anger was under control. (Id.) Another note dated January 4, 2011 indicated Claimant was "doing much better on current medication" and that he was working. (Id.) The ALJ noted that by March 9, 2012, Claimant reported that "his social anxiety had worsened", but by April 10, 2012, his social anxiety and anger "have improved quite a bit with current medication". (Id.) The ALJ further noted that on June 12, 2012, Claimant reportedly was "doing well except for frequent panic attacks and anger problems, and then by March 11, 2014, Claimant was "sleeping well with medication". (Id.) Based on these records and others[9], the ALJ found that the evidence supported Claimant's severe mental impairment of generalized anxiety disorder. (Id.)

The ALJ referenced the post-hearing brief submitted by Claimant contending that he had additional severe mental impairments beside anxiety as testified to by Dr. Adamo, and that

_____

information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

[9] The June 27, 2012 psychological evaluation provided by State agency consultant Kara Gettman-Hughes, M.A., diagnosed Claimant with generalized anxiety disorder, panic disorder with agoraphobia, and bipolar disorder, NOS. (Id.)

Claimant's "attorney noted the treating physician opined that the claimant's impairments precluded work". (Tr. at 23.) Nevertheless, the ALJ found Dr. Adamo's opinion was entitled to greater weight "based on her program knowledge and specialty in mental impairments", and further noted that "Dr. Viradia's opinion regarding Claimant's mental condition is out of his area of expertise and therefore given less weight." (Id.)

The ALJ also considered the March 8, 2013 report from Dr. Viradia that Claimant "had been suffering from longstanding mixed bipolar disorder, attention deficit with hyperactivity, aggression, and anger frequently" and that Dr. Viradia opined that Claimant was unable to work due to "issues of concentration and anger". (Tr. at 24.) The ALJ expressly gave "no weight" to Dr. Viradia's "statement indicating the claimant is 'permanent disability' or 'unable to work' as this is not a medical opinion, but rather an administrative finding dispositive of a case". (Id.) The ALJ further explained that Dr. Viradia's opinion concerning Claimant's mental limitations "is out of this physician's area of expertise", and gave greater weight to Dr. Adamo's opinion, "an impartial medical expert, based on her program knowledge, specialty in mental impairments, and she had the advantage of reviewing the entire record". (Id.)

It should be noted from the onset that the ALJ's determination that "no weight" be given to Dr. Viradia's opinion regarding Claimant's ability to work as issues reserved to the Commissioner are not entitled to any special significant weight is authorized pursuant to 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). However, the ALJ only expressly discounted the opinion of Claimant's treating physician, for two reasons: Dr. Viradia lacked the expertise regarding Claimant's mental condition, and ostensibly by negative implication, he lacked "program knowledge". The ALJ specifically mentioned Dr. Adamo's specialty in mental impairments and

her program knowledge, and her having examined the entire record. (Tr. at 23, 24.) In this regard, the undersigned agrees with Claimant that the ALJ did not provide "good reasons" for giving Dr. Viradia's opinions no weight: there was no discussion as to whether his opinion was inconsistent or consistent with the record as a whole; there was no discussion regarding the length of treatment or the frequency of the examination; there was no discussion regarding the nature and extent of the treating relationship, save for the ALJ's finding Dr. Viradia was not a mental impairment specialist, although the only records from Dr. Viradia discussed involved nearly three and a half years of mental health treatment.[10] In short, under the auspices of 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), the undersigned finds that the ALJ did not provide "good reasons" to give "less weight" or "no weight" to Dr. Viradia's opinion because the explanation failed to consider those factors enumerated supra.[11] Accordingly, the undersigned finds Claimant's argument on this issue has merit.

    Evaluating State Agency Consultant Opinions and RFC Assessment:

    At steps four and five of the sequential analysis, an ALJ must determine a claimant's RFC for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545, 416.945. "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but

---

[10] The undersigned recognizes that the thrust of Claimant's application for benefits concerned mental impairments and that Dr. Viradia was his primary care physician, however, he primarily treated Claimant for his mental health conditions.

[11] See, generally, Newhart v. Colvin, 2014 WL 1330929 (S.D.W.Va. March 31, 2014); the undersigned is mindful that the treating physician in Newhart was the claimants treating psychiatrist, however, "specialization" is just one of the factors used to determine the weight given to a treating source's opinion according to the Commissioner's Regulations.

is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1546, 416.946.

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a per se rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Id. Rather, the Fourth Circuit adopted the Second Circuit's approach

that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). More recently, the Fourth Circuit observed that regarding RFC assessments, an ALJ must "'build an accurate and logical bridge from the evidence to his conclusion.'" Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

Claimant takes issue with the ALJ having given "greater weight" to Dr. Adamo's opinion over the two State agency psychological opinions provided by Drs. Comer and Boggess without adequate explanation prior to making his RFC assessment, therefore frustrating meaningful review. (Document No. 11 at 11-14.) The ALJ first considered Claimant's testimony, which included a narrative of his daily chores, video game hobby, as well as his anger outbursts and social anxiety. (Tr. at 21.) The ALJ next determined that Claimant's statements concerning the intensity, persistence and limiting effects of his medically determinable impairments were not entirely credible based on the evidence of record, which included Dr. Viradia's treatment notes, discussed supra, as well as the June 27, 2012 consultative psychological evaluation performed by Kara Gettman-Hughes, M.A., discussed supra. (Tr. at 22.) Interestingly, the ALJ did not expressly assign any weight to Ms. Gettman-Hughes's opinion, only that he noted that her diagnoses "appear based on the claimant's subjective complaints", which included generalized anxiety disorder, panic disorder with agoraphobia, and bipolar disorder NOS, yet he found only Claimant's generalized anxiety disorder as a severe impairment at step two of the sequential evaluation process. (Tr. at 19, 22.)

The ALJ noted that Dr. Adamo testified that Claimant "has evidence of a generalized anxiety disorder which would limit him to simple work in a low stress work environment with limited public contact" (Tr. at 23.) The ALJ further noted that Dr. Adamo testified that "no one has observed any evidence of anger outbursts and these outbursts would not be consistent with an anxiety disorder." (Id.) Dr. Adamo's opinion was given "great weight" due to "her program knowledge, her specialty in mental impairments, and she explained her opinion with explanation."[12] (Id.) (emphasis added) The ALJ also discussed the mental RFC provided by Dr. Comer, and Dr. Boggess's affirming opinion thereof, and gave "some weight" to these opinions, but still gave "greater weight" to Dr. Adamo's opinion, as she "had the benefit of reviewing the entire record". (Id.)

There was discussion as to why Claimant's bipolar or anger issues were not considered in the decision, or in the RFC assessment, despite the fact that Dr. Viradia had treated Claimant for these conditions for several years with medication, where even State agency examiner Ms. Gettman-Hughes diagnosed Claimant with bipolar disorder. The ALJ only noted that Claimant reported no side effects from his medication, and that Dr. Viradia's records indicated Claimant's anger problems were generally controlled with medication. (Tr. at 22.) Nevertheless, the ALJ did not satisfactorily explain in his decision why the diagnoses of bipolar disorder by Dr. Viradia and Ms. Kara Gettman-Hughes were discredited; or indeed why the evidence concerning Claimant's

---

[12] The undersigned is unsure what precisely the ALJ meant by this, but notes that Dr. Adamo's testimony was based on her review of the record, and she testified that Claimant's generalized anxiety disorder was a severe impairment, and that the "evaluation is under 12.06 indicates Part B limitations of moderate – moderate – moderate and non – and mental visual functional capacity assessment would limit him to simple work in a low-stress work environment with [limited public contact]" as the extent of the MRFC. Regarding Claimant's angry outbursts, Dr. Adamo testified that Claimant's "primary doctor who sees him regularly never seemed to observe [them], and "there wasn't any accuracy on the psychological exam." Dr. Adamo further testified that "[o]n Page 5 of [Exhibit] 7-F, the doctor who prescribes the medicines says that the Claimant reports that his anxiety, depression and anger is well controlled." (Tr. at 46-47.)

panic disorder was discredited. The ALJ did not explain why Claimant's testimony concerning his anger outbursts was discredited. Accordingly, the undersigned agrees with Claimant's argument on this alleged ground of error, that the ALJ did not provide adequate explanation for his RFC assessment or what evidence in particular led to his conclusions, thereby, failing to construct the "logical bridge" necessary for meaningful judicial review.

      Evaluating Lay Person Opinion/Statements:

      Sections 404.1513(d) and 416.913(d) provide that the Commissioner may also use evidence from other sources to show the severity of a claimant's impairment(s) and how it affects a claimant's ability to work; such "other sources" include non-medical sources, such as siblings. See 20 C.F.R. §§ 404.1513 (d)(4), 416.913(d)(4) (emphasis added). Claimant cites an unpublished opinion, Morgan v. Barnhart, 142 Fed.Appx. 716 (4th Cir. 2005) in support of his contention that the ALJ erred by failing to consider his sister's statements in support of his claim. (Document No. 11 at 14-16.) Though the undersigned agrees that other non-medical sources like Ms. Cross can provide a unique perspective on a claimant's impairments, the problem in this case is that her 'statements' were not her own views that would be subject to analysis and evaluation as envisioned under the Regulations, or even Morgan. In Morgan, the "other non-medical sources" involved the claimant's husband's and daughter's written responses to questionnaires, indicating that such evidence was independent from the SSA forms, which the ALJ therein considered, although discounted. 142 Fed.Appx. at 724-725.

      There is no dispute that Ms. Cross completed Claimant's SSA forms on his behalf and initially served as his representative in pursuit of his claim, therefore, there is no reason that the ALJ would have considered Ms. Cross's 'statements' as evidence independent from Claimant's.

There is no indication from the record that Claimant or his representative wished to have Ms. Cross testify or submit her own opinion or statement in support of Claimant's application for benefits. Moreover, the undersigned agrees with the Commissioner that there were Third Party forms available that Ms. Cross could have completed to further her brother's claim, but she did not. Despite Claimant's argument that Ms. Cross's observations "materially contradict" Dr. Adamo's testimony that no one observed Claimant's outbursts, the burden of proof to sustain a claim for disability benefits is borne by Claimant, who also bears the risk of nonpersuasion. See, Seacrist v. Weinberger, 538 F.2d 1054, 1057 (4th Cir. 1976). Further, had the ALJ considered Ms. Cross's 'contradictory statements' to compare with Dr. Adamo's testimony, such inconsistencies in the evidence are to be reconciled by the Commissioner, not the Court. See Hays v. Sullivan, supra. Accordingly, the undersigned finds the ALJ committed no error on this ground as alleged by Claimant.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 16.), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to provide an appropriate evaluation of treating physician Dr. Arvind Viradia's opinion as well as to provide further explanation for what evidence supported the Commissioner's ultimate conclusions.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District

Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 31, 2016.

Omar J. Aboulhosn
United States Magistrate Judge